# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- x

DSB HOLDINGS, LLC, as assignee of GALVSTAR LLC,

                  Plaintiff,

                -against-

PIONEER INVESTMENT MANAGEMENT, INC., n/k/a AMUNDI PIONEER ASSET MANAGEMENT,

                Defendant.

-------------------------------------------------------------- x

Index No. 655566/2019

**SUMMONS**

*A TRUE COPY ATTEST*
*DAVID D. AYLES, PROCESS SERVER*
*AND DISINTERESTED PERSON*

To:    PIONEER INVESTMENT MANAGEMENT, INC.,
        n/k/a AMUNDI PIONEER ASSET MANAGEMENT,
        60 State Street
        Boston, Massachusetts 02109

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer on Plaintiff's Attorneys within twenty (20) days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or within thirty (30) days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       September 24, 2019

                       **REISS SHEPPE LLP**

                       By:    Matthew Sheppe
                       425 Madison Avenue, 19th Floor
                       New York, New York 10017
                       Tel: (212) 753-2424

                       *Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DSB HOLDINGS, LLC, as assignee of GALVSTAR
LLC,

Plaintiff,

v.

PIONEER INVESTMENT MANAGEMENT, INC.,
n/k/a AMUNDI PIONEER ASSET MANAGEMENT,

Defendant.

Index No. 655566/2019

**COMPLAINT**

Plaintiff DSB Holdings, LLC ("DSB"), as and for its complaint against Defendant

Pioneer Investment Management, Inc., n/k/a Amundi Pioneer Asset Management ("Pioneer"),

alleges upon personal knowledge as to its own acts and status and upon information and belief as

the acts and status of all others as follows:

## I.  NATURE AND SUMMARY OF THE ACTION

1.  At the heart of this action are improper *sub rosa* actions, instituted by a high level

manager of defendant Pioneer — the lender which had funded Galvstar's steel

plant and which was its major bondholder — through which that manager schemed with others

to undermine Galvstar's ability to pay its operations costs and bond-debt as part of the goal

of usurping control of the valuable Galvstar plant, from its founders, and taking control

himself.

2.  More particularly, as pleaded in detail below, that high level manager, Timothy Pynchon,

utilized his standing within Pioneer, and the consummate power that came with being Galvstar'

senior lender, to team up with Galvstar's landlord and thereafter Galvstar's business partner to take over the plant. Specifically, following a series of private meetings that occurred in April 2013, Galvstar's business partner cancelled orders, ceased making payments under existing invoices, and cryptically reported that they planned to continue to participate in Galvstar's business, just from a different angle. Galvstar's landlord at the same time removed critical equipment from the plant, and knowing that Galvstar's revenue stream was halted, noticed a default under Galvstar's lease. Faced with this carefully choreographed and coordinated attack to destabilize the company, Galvstar was ultimately forced to shut down.

3.      Galvstar started operating in its new plant in Buffalo, New York in the summer of 2012. Shortly thereafter, the plant was independently appraised with a fair market value between $124.25 to $144.92 million.

4.      In the fall of 2012, Galvstar began working with another steel company, Harvard Steel Sales, LLC ("Harvard"). Over the course of the next few months, the relationship between the two companies became more extensive and Harvard began to play an increasingly large role in Galvstar's development.

5.      In February 2013, as the logical outgrowth of the existing relationship between the companies, Galvstar Holdings, LLC ("Galvstar Holdings", which owned Galvstar) worked with Harvard to provide Galvstar with sufficient financing and distribution to ensure Galvstar's success. Further, Galvstar and Harvard entered into a toll processing agreement that guaranteed sufficient supply to increase production at Galvstar and, in turn, sales.

6.      Galvstar kept Pioneer, the fund holding 99% of Galvstar's Bonds (hereinafter defined), through Timothy Pynchon, the portfolio manager at Pioneer who was responsible for

2

the Bonds, informed in great detail about its relationship and plans with Harvard including how reliant Galvstar was on Harvard.

7. In April 2013, unbeknownst to Galvstar, Timothy Pynchon, the portfolio manager for Pioneer, hatched and carried out a secret plan to try to personally and professionally profit from Pioneer's investment in Galvstar. In carrying out his plan to try to profit to Galvstar's detriment, Pynchon breached Pioneer's contract with Galvstar by improperly utilizing confidential information and by taking advantage of Pioneer's contractual role as lead lender to the company.

8. Despite confidentiality and contractual obligations preventing the use of Galvstar's confidential information for any purpose but to monitor its investment, Pynchon met privately with Galvstar's landlord and biggest customer and hatched a plot to try to take over Galvstar.

9. To successfully take over the company, Pynchon understood he needed Harvard's support to eliminate Galvstar's largest source of income and to secure Harvard as a major customer when they took charge of the company.

10. To get Harvard's support, Pynchon insisted on meeting privately with Harvard without Galvstar representatives in the room. Pynchon insisted to Galvstar both prior to and afterwards that nothing was said to Galvstar's detriment at these meetings. To the contrary, not only was the takeover plan discussed at this meeting, but Pynchon secretly sent Harvard email messages detailing his takeover plan—and both Pynchon and Harvard lied to Galvstar about these communications.

3

11. As part of the scheme to take over the company, Pynchon coordinated an effort to ratchet up financial pressure on Galvstar, by convincing Harvard to breach its toll processing agreement with Galvstar and otherwise join in Pynchon's efforts.

12. To that end and to further its efforts, Pynchon and Pioneer improperly used its role as a lender and Galvstar's confidential financial information in violation of the agreements governing the Bonds.

13. As a result of Pioneer's breach of contract, Harvard stopped doing business with Galvstar and breached its agreements with Galvstar and Galvstar Holdings, including refusing to (i) pay invoices, (ii) make further orders, and (iii) move forward with its obligations under the toll processing agreement; and (iv) continue to help co-manage Galvstar.

14. To compound its misdeeds, Pynchon and Pioneer lied to Galvstar about the true nature of its actions and while it was scheming to take over Galvstar, it was telling Galvstar and acting as if it was still just one of Galvstar's bondholders, merely interested in Galvstar's financial outlook.

15. As a direct and proximate result of Defendants misconduct, Galvstar became insolvent, was unable to pay its creditors, and was forced to shut down.

## II.   JURISDICTION AND VENUE

16. This Court has jurisdiction over this action because both Plaintiff and Defendant regularly do business in the State of New York and because Plaintiff is a resident of New York State.

17. Personal jurisdiction over Defendants is proper pursuant to CPLR § 301 and § 302 because the causes of action herein arise from Defendant's transacting business in New York State.

4

INDEX NO. 655566/2019

RECEIVED NYSCEF: 09/24/2019

18.     Venue is proper under CPLR § 503 because Plaintiff's principal place of business is in New York County.

### III.     PARTIES

#### A.     Plaintiffs

19.     Plaintiff DSB is a Delaware limited liability company with its principal place of business located at 301 W. 57th Street, #39D, New York, New York 10019.  DSB is the assignee of Galvstar's rights and interests under the Bonds.

#### B.     Defendants

20.     Defendant Pioneer is a Delaware corporation with its principal place of business located at 60 State Street, Boston, Massachusetts 02109.

### IV.     FACTUAL ALLEGATIONS

#### A.     The Formation of Galvstar

21.     After several years of project development, on March 2, 2010, Daniel Bain formed Galvstar for the purpose of operating a continuous hot-dip steel galvanizing facility in Buffalo, New York.  Galvstar is wholly owned by Galvstar Holdings.  Daniel Bain was the manager of Galvstar.

22.     As a new company, Galvstar sought financing to begin operating.  In October 2010, Galvstar obtained financing for the new steel hot-dip galvanizing plant pursuant to an Installment Sale Agreement between Erie County Development Agency and Galvstar and a Master Indenture of Trust.

23.     The Installment Sale Agreement provided that Erie County Development Agency would issue $19.995 million of municipal bonds (the "Bonds") to finance, among other things, (i) the acquisition of a subleasehold interest in an approximately 120,000 square foot

5

manufacturing facility and (ii) the acquisition and installation of equipment and improvements of the leased property for use as a continuous steel processing facility.

24.    At the time of issuance of the Bonds, Pioneer purchased 100% of the Bonds. Timothy Pynchon was the portfolio manager at Pioneer. During the relevant time period, Pioneer owned 99% of the bonds.

25.    In an investment letter agreement dated October 22, 2010, Pioneer agreed to be bound by the terms of the Bonds, which included the terms of the Master Indenture of Trust.

26.    Under Section 7.8(f) of the Master Indenture of Trust, "each Holder and Beneficial Owner agreed as a condition to acceptance of the Bonds owned by it that such Holder or Beneficial Owner shall hold all confidential information of the Company confidential, shall not disclose it to any third party and shall not use it for any purpose other than monitoring its investment in the Bonds."

27.    In addition to the financing from the bonds, Galvstar was further financed by $8.3 million in equity, funded by Galvstar Holdings, LLC (a company owned by Bain Partners LLC).

### B.    Galvstar's Startup Period

28.    Galvstar signed a long-term lease with landlord and lessor, East Delavan Property, for the galvanizing plant to be located at 1001 E. Delavan Street in Buffalo, New York (the "Lease Agreement").

29.    East Delavan Property was and continues to be managed by Jon Williams.

30.    Between October 2010 and the first quarter of 2012, the galvanizing plant was procured and built, and by March 2012, Galvstar started to ship processed steel.

31.    After Galvstar had been operating for a few months, TOA Consulting Service Ltd. ("TOA") independently appraised the Galvstar plant. TOA found that the plant had a fair market

value between $124.25 and $141.92 million. TOA's valuation was in line with the sale price of new operating galvanizing plants as well as the replacement cost for similar plants.

32.     Bain sent Pynchon TOA's independent appraisal of the Galvstar plant.

### C.     The Development of the Galvstar-Harvard Relationship

33.     In early November 2012, Bain was introduced to Jeremy Jacobs, President of Harvard. Soon after this introduction, Harvard and Galvstar began working together closely in an effort to make Galvstar a success.

34.     Beginning in the fall of 2012, Harvard and Galvstar began to jointly manage sales, purchasing, and operations of Galvstar, with Galvstar's top management providing Harvard with daily, and sometimes hourly reports.

35.     In addition to joint management, Harvard assisted with financing of the Galvstar plant, and, in December 2012, Harvard took title to steel in Galvstar's plant and financed 100% of Galvstar's production.

36.     As part of their developing relationship, Galvstar and Harvard negotiated an agreement that provided for Galvstar to apply a galvanized coating on Harvard-supplied steel coil (the "Toll Processing Agreement").

37.     On February 20, 2013, Galvstar and Harvard agreed to the principal terms of the Toll Processing Agreement: (i) the minimum tonnages would be greater than 5,000 tons per month and (ii) the tolling fee would be at least $70/ton, to be adjusted downward for non-prime steel greater than 5%. The term of the Toll Processing Agreement was for five years with a six-month cancellation provision.

7

38.     Galvstar Holdings and Harvard ultimately agreed to become partners in an effort to give Harvard a share of the Galvstar's toll processing operation and Galvstar Holdings a share of the trading profits Harvard was earning from the steel Galvstar was processing.

### D.     Galvstar Holdings and Harvard Work Together

39.     On February 27, 2013, Bain, Jacobs, and Greg Goad, Chief Commercial Officer of Harvard, met in Erie, Pennsylvania. During the meeting, Jacobs stated that, after extensive due diligence, he and his partners at Harvard were ready to ramp up the Galvstar plant to full production, finance and supply raw materials, toll process steel, and sell finished product. In exchange, Jacobs required that Harvard would be 50/50 partners in Galvstar.

40.     Bain responded that he was willing to agree, but wanted to share in 50% of the profits in the joint trading operation in exchange for the shares. Jacobs agreed.

41.     As part of their agreement, Harvard committed to finance Galvstar's working capital and purchase equity in Galvstar. Further, Harvard would manage the sales and purchasing, while Bain, through Galvstar Holdings, would manage the plant operations.

#### 1.     Galvstar Holdings and Harvard Jointly Manage and Operate Galvstar

42.     Following their agreement on the management of Galvstar, Harvard took a direct role in managing Galvstar and integrating systems between Harvard and Galvstar Holdings, building upon the relationship formed between the companies that had developed over the previous months.

43.     During this time, Bain had kept Pynchon apprised of the status of the Galvstar operation. He provided frequent updates regarding the negotiations with potential mezzanine lenders, the Toll Processing Agreement with Harvard, operations, sales, and details regarding the Harvard-Galvstar Holdings relationship.

8

44. Bain conveyed to Pynchon that, as a result of the Toll Processing Agreement and management with Harvard, Galvstar would have sufficient business to generate funds to repay its bonds.

### E. Pynchon Uses his Role at Pioneer to Destabilize and Try to Take Over Galvstar

45. On or about early to mid April 2013, Pynchon met in Buffalo, New York with Williams, manager of Galvstar's landlord East Delavan Property. Pynchon later told Bain that he was meeting with Williams to discuss deals Pynchon was working on outside his work at Pioneer.

46. Upon information and belief, it was at these meetings that Pynchon and Williams hatched a plan to try to take over Galvstar.

47. As the Portfolio Manager at Pioneer, Galvstar's senior lender, Pynchon had access to Galvstar's confidential information.

48. Pynchon knew that in order to take over Galvstar, he needed to destabilize the company and have a commercial partner to source raw materials and distribute finished goods after any takeover. Therefore, Pynchon knew that he had to recruit Harvard, Galvstar's commercial sourcing and sales partner, to participate in his takeover plan.

#### 1. Pioneer and Pynchon Seek to Recruit Harvard

49. On April 17, 2013, the day following a machinery breakdown at Galvstar, Pynchon requested a meeting with Galvstar's management and insisted that representatives from Harvard attend. Pynchon also requested that Williams, Galvstar's landlord, attend the meeting. Bain refused to allow Williams to attend because he considered the meeting to be a private and confidential due diligence meeting with Pioneer.

9

50.     Pynchon visited the Galvstar plant on or about April 25, 2013 to meet representatives from Harvard, including Jacobs. Pynchon insisted that Harvard's representatives meet that same day with Williams and that Pynchon be allowed to meet alone with Harvard as part of purported due diligence.

51.     Upon information and belief, but unbeknownst to Galvstar and its shareholders at the time, at that private meeting, Pynchon told Jacobs that he wanted to replace Bain with a new team managed by Williams. He also asked Jacobs if Harvard would be willing to be involved in the project if Bain were no longer involved.

52.     At the private meeting, Pynchon told Harvard that he was looking to privately team up with Williams to take over the plant. Pynchon proposed that Harvard join him and Williams to accomplish this objective. Pynchon asked the representatives from Harvard to keep the discussion confidential from Bain.

53.     After the meeting, neither Pynchon nor Jacobs informed Bain what was said at the private meeting. When Bain asked, both stated that nothing was said that would be of concern to Galvstar's management.

54.     Around this time, Jacobs told Gregory Goad, a Harvard employee who also attended the private meeting, that Harvard needed to find a way to get out of its agreements with Galvstar.

### 2. Pynchon Coordinates Efforts with Harvard and East Delavan Properties to Squeeze and Attempt to Take Over Galvstar

55.     Within a week of this meeting, Harvard canceled its May production orders even though the production line was running again following a machinery failure.

56.     Harvard then notified Galvstar that it would not make June or other forward orders.

10

57.     The week following the April 25, 2013 meeting with Pynchon, without any explanation, Harvard stopped paying Galvstar and refused to pay Galvstar nearly $500,000 of due invoices.  Jacobs conceded to Bain that Harvard owed Galvstar money, but provided no explanation for withholding payment.

58.     Harvard understood that it was Galvstar's sole supplier and "lifeline."  During the first week of May 2013, it took advantage of that leverage by demanding that the Toll Processing Agreement be amended to remove all material commercial terms, including both price and quantity, so that Harvard could insert them at its convenience.  Jacobs informed Bain that "the deal would stay the same" but that Harvard required the revisions in order to move forward and pay Galvstar.

59.     As Harvard was keenly aware, due to the critical need of Harvard ordering steel from Galvstar to keep the company from shutting down, Bain had no choice but to sign the contract or the company would immediately fail.  Jacobs dated the contract as of December 15, 2012.

60.     On May 8, 2013, the machinery was fully restored and the line started operating again.  Galvstar fully processed Harvard's April order.

61.     By the end of May 2013, Harvard failed to make payments on the amounts it owed Galvstar.

62.     Soon thereafter, Harvard had completely stopped doing business with Galvstar, including refusing to make its payment obligations or continuing with its obligations to manage Galvstar.

63.     When Bain asked Jacobs why Harvard was not moving forward as agreed, Jacobs cryptically responded that he still had an interest in the Galvstar plant, but now was looking to

11

participate from a different direction. In retrospect, it is clear that Jacobs was referring to the plan secretly shared with him by Pynchon.

64.     As a result of Harvard's sudden refusal to do business with Galvstar, sales halted and investors in the company stopped funding capital. As a result, Galvstar was forced to stop production.

65.     By early June 2013, because Harvard had failed to make payment and place additional orders, Galvstar was forced to lay off most of its employees.

66.     While simultaneously coordinating efforts with Harvard to destabilize and attempt to take over Galvstar, Pynchon also coordinated with Galvstar's landlord, Williams from East Delavan Properties to put pressure on the company from another direction.

67.     Beginning in mid-April 2013, Williams, with Pynchon's assistance, took a series of steps to undermine the Galvstar operation in an effort to take over the company.

68.     Williams's actions were not consistent with any landlord's economic interest as his actions guaranteed that Galvstar would not be able to pay its rent and ensured Galvstar's demise. Rather than work out a deal with Galvstar, whereby Galvstar could operate to pay its rent, Williams and Pynchon sought to destabilize the company for their own benefit.

69.     On April 19, 2013 – three days after a machinery breakdown – East Delavan Property served Galvstar with a Notice of Default on its rental agreement. East Delevan Property sent this the Notice while Bain and Williams were in the midst of discussions regarding rental payment.

70.     On May 1, 2013, Williams removed equipment from the plant that was critical to the operation and sent notices to Galvstar threatening to shut down access to key plant equipment and inventory space. This created an immediate crisis for Galvstar because Galvstar had

12

thousands of tons of steel on the plant floor, and was in the process of restoring full plant operations to continue processing that steel. Williams's actions ensured Galvstar would not be able to pay its rent, furthering the company's ultimate failure.

71.     The following day, Pynchon contacted Galvstar management and offered to be a mediator to resolve the issues between Bain on the one hand and Harvard on the other. At this point, Galvstar management had not told Pynchon that Harvard had canceled its orders and was withholding payment. In retrospect, and with the benefit of emails not disclosed at the time, it is now clear that Pynchon, using his role and access as Portolio Manager at Pioneer, had helped orchestrate Galvstar's sudden misfortunes.

72.     Although Williams had agreed to forebear and attempt to reach an amicable resolution, within hours of reaching that agreement, Williams backed out and repossessed mobile equipment he sold to Galvstar that was critical to the plant's operation.

73.     Bain notified Pynchon that East Delavan Property had threatened foreclosure and other action that would prevent the plant's ability to run. Bain further explained that East Delevan Property threatened eviction which would require that the galvanizing plant equipment be removed from the premises, making the plant nearly worthless and diminish the value of the company and equipment to scrap value.

74.     In response, on the afternoon of May 3, 2013, Pynchon sent Bain a letter dated May 2, 2013 to send to Williams mapping a potential path forward. It proposed that Bain would cede control of the business to Williams and Harvard in exchange for an investment. Pynchon then followed up with a second email with a proposed equity breakdown of Galvstar with proposed ownership percentages that reflected that Bain's ownership interest would be diluted so he would no longer own a majority of Galvstar.

13

75.    Unbeknownst to Galvstar and Bain at the time, Pynchon was working with Williams to intentionally put financial pressure on Galvstar to force the change in ownership that Pynchon and Williams desired.  Further, Pynchon was sharing and using confidential information he received from Bain with Williams to aid Williams's plan to take over the company.

76.    Also unbeknownst to Galvstar and Bain at the time, Pynchon had emailed his plans to Jeremy Jacobs at Harvard as part of Pynchon's plan to takeover Galvstar.  Pynchon purposefully did not tell Galvstar or Bain that he was communicating with Jacobs about a plan to takeover Galvstar and, in fact, insisted to Bain that he did not share the takeover plan with Jacobs or Harvard.

77.    On July 1, 2013, East Delavan Property sent a notice to Galvstar to terminate the Lease Agreement and evict Galvstar on October 1, 2013.  There was no legitimate economic basis upon which Williams did this unless he was scheming with Pynchon as the default was over several hundred thousand dollars in allegedly overdue payments related to the construction of the Galvstar plant (which amounts Galvstar disputed), and even though Galvstar was current on its rent payments and East Delavan stood to earn millions from Galvstar's rent in the coming years.

78.    On July 5, 2013, Galvstar received a Second Notice of Default from East Delevan Property, triggering the need for full resolution by no later than 90 days from the date of the notice or East Delevan Property could terminate the lease.

79.    Also in July 2013, Jacobs informed Bain that, although Harvard owed Galvstar money for the processed steel, Harvard would not pay Galvstar until "at least after October" 2013.

14

80.     Harvard, Pynchon, and Williams knew that if Harvard did not pay Galvstar until October 2013, Galvstar would not have the funds to pay its rent by the deadline imposed by Williams. As a consequence, Williams would be able to foreclose on the property and Galvstar could be purchased for a steep discount.

81.     Harvard never paid Galvstar the approximately $500,000 it owed to the company.

82.     On October 1, 2013, East Delavan Property terminated its lease with Galvstar.

### 3.     Galvstar Shuts Down Operations

83.     By September 2013, Galvstar was forced to lay off its remaining employees.

84.     As a result of Pynchon's scheme to take over the Galvstar plant and resulting interference with Galvstar's relationship with Harvard Galvstar's Toll Processing Agreement, and Harvard's breach of that agreement, Galvstar was forced to shut down operations.

85.     On September 26, 2013, Bain first learned of Pynchon's actions at the April 25, 2013 meeting where he met with Harvard, among others, and lied to Bain about what they discussed and asked Harvard to lie to Bain as well. Bain (and Galvstar) did not learn of Pynchon's purposefully undisclosed communications with Harvard/Jacobs until years after that.

### F.     Pioneer's Debt Was Satisfied

86.     Through its ownership of the Bonds, Pioneer had a first lien on Galvstar's equipment.

87.     RB International Finance ("RB International"), who provided additional debt financing to Galvstar, had a first lien on Galvstar's other assets.

88.     DSB Holdings purchased RB International's ownership interest in the Galvstar debt that RB International held, which purchase was approved by Pioneer.

89.     In April, 2016, Pioneer foreclosed on Galvstar's equipment in full satisfaction of the Bonds.

90.     Thereafter, DSB Holdings foreclosed on Galvstar's remaining assets, including the right to bring this lawsuit.

## V.     CLAIMS FOR RELIEF

### COUNT ONE:

91.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

92.     As the portfolio manager and primary bondholder of Galvstar's bonds, Pioneer and Pynchon were privy to confidential information about Galvstar and Galvstar Holdings.

93.     Under Section 7.8(f) of the Master Indenture of Trust, "each holder and Beneficial Owner agrees as a condition to acceptance of the Bonds owned by it that such Holder or Beneficial Owner shall hold all confidential information of the Company confidential, shall not disclose it to any third party and shall not use it for any purpose other than monitoring its investments in the Bonds."

94.     In an investment letter agreement dated October 22, 2010, Pioneer agreed to be bound by the terms of the bonds, which included the terms of the Master Indenture of Trust.

95.     Pynchon, as Pioneer's agent, breached the Master Indenture of Trust by using confidential information he received about Galvstar and Galvstar Holdings, including financial information, contracts, and knowledge of relationships with creditors by virtue of his role as portfolio manager, for purposes other than monitoring Pioneer's investments in the bonds.

96.     Pioneer and Pynchon used the confidential information to interfere with Galvstar's contract with Harvard, to conspire with Williams to take over Galvstar to the

16

detriment of Galvstar, and, as to Pynchon, to profit personally by investing in the Galvstar operation.

97.     Implicit with any contract is a duty to act in good faith.  As a lender, Pioneer had a duty to not use its rights to access and use Galvstar's confidential information or Pioneer's rights as a lender to the company to try to destabilize or take over the company.  Pioneer's and Pynchon's actions to leverage its role as lender also breached the implied covenant of Good Faith and Fair Dealing.

98.     As direct and proximate result of Pynchon's and Pioneer's breach of the Master Indenture of Trust, Plaintiffs have been damaged in an amount to be determined at trial.

## VI.     DEMAND FOR A JURY TRIAL

99.     Plaintiffs hereby demand a trial by jury on all claims so triable.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff DSB Holdings prays for relief and judgment against Defendant as follows:

1)     awarding damages in favor of Plaintiff against Defendant for damages sustained as a result of Defendant's breach of contract and breach of duty of good faith and fair dealing in an amount to be proven at trial, together with interest thereon;

2)     awarding prejudgment interest or opportunity-cost damages in favor of Plaintiff;

3)     awarding Plaintiff the fees and expenses incurred in the prosecution of this action, including attorneys' fees; and

17

4)     granting such other and further relief as the Court deems just and proper.


Dated:  September 24, 2019
        New York, New York

                       **REISS SHEPPE LLP**

By: _____
                Matthew Sheppe

                425 Madison Ave., 19th Floor
                New York, New York 10017

                Tel: (212)753-2424
                Email: msheppe@reisssheppe.com

                *Attorneys for Plaintiff DSB Holdings, LLC*

18

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK
------------------------------------------------------------------x
DSB HOLDINGS, LLC, as assignee of
GALVSTAR LLC

                  Plaintiff/Petitioner,

        - against -                       Index No. 655566/2019
PIONEER INVESTMENT MANAGEMENT, INC. n/k/a
AMUNDI PIONEER INVESTMENT MANAGEMENT

                Defendant/Respondent.
------------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
#### (Mandatory Case)
(Uniform Rule § 202.5-bb)

     **You have received this Notice because**:

        1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

        2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.  (<u>Attorneys</u>: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically

  - free access to view and print your e-filed documents

  - limiting your number of trips to the courthouse

  - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: ___September 24, 2019_____

## Matthew Sheppe
_____
Name

Reiss Sheppe LLP
_____
Firm Name

425 Madison Avenue, 19th Floor
_____

New York, New York 10017
_____
Address

(212) 753-2424
_____
Phone

msheppe@reisssheppe.com
_____
E-Mail

To: Pioneer Investment Mgmt
_____

60 State Street
_____

_____

6/6/18

Index #          Page 2 of 2          EFM-1